

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

—————————————————

No. 06-10-00088-CR

—————————————————

LUTHER CALDWELL, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 202nd Judicial District Court
Bowie County, Texas
Trial Court No. 08F0846-202

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley
Dissenting Opinion by Justice Carter

OPINION

After Luther Caldwell was convicted by a Bowie County jury for the murder of Greg Thomas and sentenced to life imprisonment, he has appealed. Caldwell complains that the trial court erred in limiting the evidence Caldwell was allowed to present regarding a possible alternative perpetrator of the charged murder and that the trial court should have granted Caldwell's motion for new trial based on an allegation of the discovery of new evidence. After reviewing the record and considering the parties' oral arguments, we find no reversible error and affirm the judgment.

**The Shooting**

The State's central witness was a sometime prostitute, Donna Taylor, who testified that she was personally acquainted with Caldwell. Taylor indicated that she had previously lived with Caldwell, had regularly purchased illicit drugs from him (including a purchase on the morning of the shooting), and had previously driven Caldwell's Nissan Sentra, which she alleged that Caldwell had driven while shooting Thomas.

The crux of Taylor's testimony was that on the night of September 12, 2007, she was walking along Nettie Street in Texarkana and encountered Thomas, whom she knew. As Taylor and Thomas walked along together, Taylor saw Caldwell driving his Sentra.[1] Since Taylor wanted to purchase more crack cocaine, she attempted to attract Caldwell's attention. At that time, she observed Caldwell point the barrel of a gun out the car's passenger window, shoot

_____
[1]On the stand, Caldwell said he did not own the Sentra on the date of the killing.

2

Thomas, and then drive away. Taylor, frightened, ran and hid in an alley, emerging after about ten minutes. A few blocks from the location of the shooting, she encountered another person familiar to her, Johnny Ward. Taylor told Ward she had just seen someone get shot, but testified she did not tell Ward the identity of the victim. A short time later, Taylor approached a police officer and told him she had seen "something bad." At the police station, Taylor told investigators that Caldwell was the shooter, and she identified a picture of him in a photographic line-up.

In her first statement to police the night of the killing, Taylor said she saw the gun barrel protruding from the passenger window and repeated that at the time of trial. On cross-examination, Caldwell established a temporary change in her story, pointing out that in 2008, Taylor had told the police that the gun protruded from the driver's side window and not the passenger's side window. Taylor acknowledged having misspoken in that intervening statement to police, and reaffirmed that the gun barrel projected from the passenger's side window when Caldwell drove past and shot Thomas.

In the hours after the shooting, even though Taylor had given a positive identification of Caldwell as the perpetrator, police still rounded up other persons of interest in the neighborhood and brought them in for questioning; those persons brought in for questioning included Ward and a companion, Curnediles Larry, both of whom were swabbed to test for gunshot residue. Gunshot residue tests were negative for both men. As one detective was swabbing Ward, Ward inquired

3

about the purpose of the test and, in particular, regarding the length of time which could pass between a test subject firing a gun and the ability of the test to detect a residue of gunpowder.[2] The chief investigator for the case, Detective Scott Sartor, interviewed both Ward and Larry, found their alibis persuasive to him,[3] and concluded that neither man had any connection to Thomas' slaying.

Leonard Bolton testified[4] that the day after the shooting, another person (Little Charles Ray) brought Caldwell to Bolton, and told Bolton that Caldwell had shot Thomas. Bolton said that although Caldwell was present and overheard Ray's statement, Caldwell made no attempt to deny the crime. Bolton (who admitted having engaged in the sale of illicit drugs with Caldwell) stated that Caldwell enlisted Bolton's assistance in leaving Texarkana. Bolton said that Caldwell related that he wanted to avoid the Texarkana bus station because he feared that police monitored that station with drug-detection dogs. Bolton chauffeured Caldwell to Atlanta, Texas. Missing the bus there, they proceeded south to the bus station in Marshall, Texas, from whence Caldwell departed for Stockton, California. Bolton said that throughout the drive to the various bus

---

[2]Part of Caldwell's defensive theory was to stress Ward's curiosity while being questioned by police. Ward's questions were described by Detective William Buttram:

> Ward asked me while I was taking [the swab for gunshot residue] what it was good for, or how long it was good for, what I was doing, and I didn't understand what he was asking. He wanted to know how long it would last, I guess, if he'd fired a gun, you know, a year ago if it was still there is what I presumed.

[3]The nature of these alibis was not developed.

[4]Caldwell was tried for the killing a month before the trial, which resulted in his conviction: that first trial resulted in a mistrial where the jury could not reach a unanimous verdict. Bolton did not testify at the first trial.

4

stations, Caldwell said he had "fucked up," but Bolton would not allow Caldwell to explain what he meant by that.[5] Shortly after arriving in Stockton, California, Caldwell called Bolton to tell him that he had arrived; in that conversation, Caldwell told Bolton that he had seen his picture being broadcast on a television in the Marshall bus station as a wanted man. On at least two occasions, Bolton sent money to Caldwell in California. Later, Bolton contacted police and Caldwell was located and arrested in California.

Caldwell testified in his defense. Although he admitted to being a drug dealer, he denied that he was a murderer, denying that he had anything to do with the shooting of Thomas. His explanation for going to California the day after the killing was that a shooting in the neighborhood generated the wrong kind of attention for his drug business, and he also intended to attend his brother's wedding.

**Caldwell's Alternative Perpetrator Theory**

Caldwell's defensive theory focused on Ward: through cross-examination of the State's witnesses, Caldwell suggested Ward was the killer.[6] The trial court limited the evidence Caldwell was allowed to present to the jury, precluding him from showing a possible motive Ward may have possessed to kill Thomas, as well as a short document (generated by prosecutors or law

---

[5]Bolton was evidently trying to limit his knowledge of the crime and his own culpability. In acknowledging he could be indicted for his involvement, and explaining why he would not let Caldwell say more, Bolton said, "I didn't want to know about it. I didn't want to be -- I didn't want to be here [testifying] today."

[6]In law enforcement circles, this is often known as the SODDI ("some other dude did it") defense. *James v. State*, 48 S.W.3d 482, 486 (Tex. App.—Houston [14th Dist.] 2001, no pet.).

enforcement on an interagency computer program), which suggested Ward had killed Thomas. This limitation on the evidence Caldwell was allowed to present is the source of one of Caldwell's complaints on appeal. We affirm the trial court's ruling.

*Evidence Not Permitted by the Trial Court*

Four or five days before Thomas was killed, Ward was alleged to have been involved in a shooting in the same neighborhood where the instant killing occurred. In that case, Ward was alleged to have shot a man who was standing with Thomas and a third man. Thomas gave a statement to police in which he identified Ward as the shooter in that case. Caldwell asked the trial court to allow him to present this evidence of accusations about Ward's earlier shooting activity as evidence that he (Ward) had a motive to kill Thomas, a witness to the prior shooting. The trial court refused to allow this evidence, although the jury was permitted to hear two police officers testify that Ward was initially considered a suspect, and was brought in for questioning in the hours immediately after the shooting.[7]

The trial court also precluded Caldwell from presenting evidence: a printout from a computer program called "Able Term." From the record and statements from the State at oral argument, Able Term appears to be a software program accessible by law enforcement officers, the prosecutor's office, and the clerk's office which is maintained for the purpose of keeping track

---

[7]Officer Jeff Johnston and Detective Buttram testified that Ward and Larry were brought to the police station for questioning in the hours after the shooting. Buttram said this was common procedure, "[Officers] bring in everybody they can." Buttram said he believed Ward and Larry were located at a convenience store close to the murder scene; he was not sure exactly how close, though. On cross-examination, Caldwell established that when officers spoke to Ward, he did not mention having spoken to Taylor that night.

6

of criminal cases. Caldwell wanted to present to the jury a printout of an entry in Able Term, which seemed to refer to the allegation of Ward's shooting at Thomas and two other men a few days before Caldwell was alleged to have killed Thomas. The entry stated in full:

1. Date / Time: 11/20/07

2. Event Code: NP (STATE DECLINED PROSECUTION)

3, Comment: DEFENDANT CHARGED W/ MURDER OF THE ONLY WITNESS IN THIS CASE

At the hearing outside the presence of the jury where Caldwell presented this Able Term evidence, the State also proffered a copy of a letter sent from the Bowie County District Attorney's Office to Caldwell's counsel, stating that while Ward had initially been a suspect in Thomas' killing, he had never been charged with that offense. More particularly, the State's letter stated that the relevant Able Term entry was "made by the District Attorney's Office," that the State declined prosecution in the earlier shooting, and that the State "has no exculpatory evidence related to the prosecution of Luther Caldwell. Although he was an initial suspect, Johnny Ward, Jr. was never charged with the murder of Gregory Thomas."

*The Law on Alternative Perpetrators*

A criminal defendant is entitled to present evidence that another party is responsible for the crime alleged against the defendant; but the defendant "must show that his proffered evidence regarding the alleged alternative perpetrator is sufficient, on its own or in combination with other

7

evidence in the record, to show a nexus between the crime charged and the alleged 'alternative perpetrator.'" *Wiley v. State*, 74 S.W.3d 399, 406 (Tex. Crim. App. 2002).[8] A defendant must do more than offering "unsupported speculation" of another, alternative perpetrator of defendant's charged offense. *Id.* at 407 n.23 (quoting *United States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998)).

The appellant in *Dickson v. State*, 246 S.W.3d 733 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd), likewise attempted to present evidence of an alternative perpetrator. In that case, Dickson was charged with aggravated robbery.[9] Dickson sought to present evidence that another person committed the charged offense; following that strategy, he was allowed to present evidence that the proposed alternate suspect resembled Dickson, lived in the area of the robberies, and had been convicted of robberies close in time to the charged offense. However, the trial court refused to allow Dickson to present photographic evidence that the alternative perpetrator resembled Dickson or introduce evidence of judgments of conviction showing the proposed alternative

---

[8]Wiley, charged with burning down his own restaurant, sought to introduce evidence that another person, a "known 'fire-starter,'" had been ejected from the restaurant a few days prior to the fire for "acting crazy," striking matches, and removing his shirt. 74 S.W.3d at 403, 405. Wiley also wanted to put on evidence this "fire-starter" was seen across the street from the restaurant when it burned. However, the defense also conceded to the trial court that this alleged alternative perpetrator likely lacked the intellectual capacity to plan and execute the fire. 74 S.W.3d at 404. Wiley instead wanted to raise the possibility this third person may have acted in concert with another arsonist. The Texas Court of Criminal Appeals agreed with the trial court that Wiley's proffered evidence was properly excluded under Rule 403. *See* Tex. R. App. P. 403; *Wiley*, 74 S.W.3d at 407.

[9]In one evening, four people were robbed at a Houston apartment complex, in three separate incidents. Dickson was charged with robbery of one person, and the State presented evidence of another victim as proof of identity of the robber. Dickson then presented the fourth victim, who testified Dickson was not his robber.

perpetrator had committed robberies one day before and twenty-two days after the charged offense. *Id.* at 237–38.

The appellate court in *Dickson* found that while the evidence Dickson sought to admit was relevant to the core issue of the case (i.e., the identity of the perpetrator), the defense nonetheless failed to present any evidence connecting the alleged alternative perpetrator to the charged offense.

> In order for a court to conclude there is a nexus between an alleged alternative perpetrator and the offense-at-issue, there must be something more than evidence that a person other than the criminal defendant was committing similar crimes around the time of the offense-at-issue, the evidence must connect the alleged alternative perpetrator to the specific offense.

*Id.* at 741. Therefore, the evidence was properly excluded. *Id.*[10]

The theory that Ward had a motive to want Thomas (a witness to the previous shooting) dead, combined with Ward's alleged involvement in a shotgun shooting in the same neighborhood just a few days prior to the instant crime and Ward's presence in the area near the time Thomas' murder occurred could be deemed to create some degree of nexus linking Ward to the killing of

---

[10]Caldwell directs us to *United States v. Stevens*, 935 F.2d 1380, 1405 (3rd Cir. 1991). That court found evidence of another person committing a crime similar to that with which Stevens was charged admissible where: two armed robberies—that for which Stevens was charged and another—occurred within a few hundred yards from each other; between 9:30 and 10:30 p.m., with a handgun; perpetrated upon military personnel; by a black assailant, who was described similarly by the victims. Stevens sought to present testimony from the black victim of the uncharged crime, who would say that Stevens was not his attacker. Stevens reasoned that because of the similarity between the crimes, they were likely committed by the same person; and the (non)identification of the black victim of the uncharged crime was more accurate/credible than the identification of the white victims in the charged crime, because same-race identifications are more accurate than cross-racial identifications. *Id.* at 1401, 1405. The court found Stevens' "reverse 404(b)" evidence admissible, based on the similarities of the crimes and the testimony regarding cross-racial identification. *Id.* at 1404–06. We take note of *Stevens*, but in light of the particulars of that case, including the expert testimony, and its differences from the case before us, do not find the Third Circuit case compelling.

9

Thomas. We review an exclusion of evidence for abuse of discretion. *Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005). A trial court abuses its discretion if its decision is outside the zone of reasonable disagreement or if it acts without reference to guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380, 391 (Tex. Crim. App. 1990) (op. on reh'g). When the trial court made its ruling, excluding the evidence of Ward's earlier shooting incident and the Able Term document, it specifically relied upon the analysis of *Wiley*. The trial court found that while there was some relevance in the proffered evidence, there was insufficient evidence to establish the nexus required by *Wiley*. Citing Taylor's testimony that Ward was not at the scene, was not the shooter, and that Caldwell was the shooter, the trial court found no such nexus and that introduction of the evidence urged by Caldwell would

> require a mini-trial, which would require the State to present witnesses to prove or disprove what happened in the other case, and that would cause confusion to this jury, and that there's not a sufficient nexus to tie [Ward] to it to make the probability great enough to outweigh that prejudicial effect.

Here, the trial court clearly based its ruling on Texas Court of Criminal Appeals precedent and the Texas Rules of Appellate Procedure. We find the trial court's ruling was in the zone of reasonable disagreement, and overrule Caldwell's point of error.

**Caldwell's Motion for New Trial**

Caldwell filed a motion for new trial, which was overruled by operation of law.[11] In that motion, he claimed that the State failed to disclose that witness Bolton had been arrested for felony

---

[11]*See* TEX. R. APP. P. 21.8(c).

10

deadly conduct and misdemeanor assault causing bodily injury—family violence.[12]  Caldwell

argued that absent this information, he was unable to fully impeach Bolton's testimony.  On

appeal, he claims his motion for new trial should have been granted.

We begin by addressing a point of procedure.  The motion for new trial does not request a

hearing, and there is nothing in the clerk's record indicating Caldwell presented the motion to the

trial court or requested a hearing.  *See* TEX. R. APP. P. 21.8; *Rozell v. State*, 176 S.W.3d 228, 230

(Tex. Crim. App. 2005); *Carranza v. State*, 960 S.W.3d 76, 78–79  (Tex. Crim. App. 1998)

("present" means deliver motion to court or bring to court's attention).  A motion for new trial

must be presented to the trial court in a timely fashion.  *See* TEX. R. APP. P. 21.6.

Caldwell directs us to a letter his counsel sent to the trial court, which says in part, "I filed

a Motion for New Trial . . . I was wondering how you wanted to handle this matter.  Please let me

know if you want to set this matter for hearing or simply rule on the motion."[13]   A defendant filing

---

[12]This information is supplied in the motion for new trial, to which is attached an offense/arrest report from May 2008, which indicates officers responded to a report of shots fired; other than Bolton being arrested for the two offenses, there is no indication formal charges were filed.

[13]This letter is attached to Caldwell's motion to supplement the record on appeal.  In the same motion, he asked to supplement by including the reporter's record from Caldwell's first trial, the mistrial.  He also asks that the attached letter to the trial court be included in the supplemented record.  We granted Caldwell's motion to supplement the appellate record, but see no indication Caldwell sent a supplemental request to the district clerk to supplement the record with the requested correspondence.  It is the appealing party's burden to ensure that the record on appeal is sufficient to resolve the issue he presents.  *Guajardo v. State,* 109 S.W.3d 456, 462 n.17 (Tex. Crim. App. 2003). This Court's letter to the parties stating that Caldwell's motion to supplement had been granted was sent to Caldwell's counsel, the court reporter, and a courtesy copy was sent to the State.  It was Caldwell's responsibility to request specific items for inclusion in the clerk's record.  *See* TEX. R. APP. P. 34.5.  A document not contained in the clerk's record is not properly before this Court for consideration.  *See Yarbrough v. State*, 57 S.W.3d 611, 618 (Tex.

11

a motion for new trial must present the motion to the trial court and obtain a hearing before the motion is overruled by operation of law. *See Rozell*, 176 S.W.3d at 231; *see also Carranza*, 960 S.W.3d at 78–79 ("present" means deliver motion to court or bring to court's attention). Mere filing of the motion for new trial with the trial court is insufficient to constitute presentment. *Carranza*, 960 S.W.2d at 78.

As in *Rozell*, the appellant here did not specifically request the trial court hold a hearing on the motion for new trial, leaving it to the trial court's discretion as to whether a hearing was to be held or whether the motion could be overruled by operation of law. Similarly, Rozell failed to affirmatively request a hearing in his motion, an action which gave the trial court the option to choose between conducting a hearing or ruling on the motion without a hearing. "[W]ithout a more specific request, [this] left to the trial court's discretion whether a hearing should be held." *Rozell*, 176 S.W.3d at 231.[14]

Notwithstanding Caldwell's failure to present his motion, request a hearing, and obtain a ruling on his motion for new trial, as required by Rules 21.6 and 21.8, we find his motion would nonetheless have been unsuccessful. The basis of the motion for new trial was newly discovered evidence that State's witness Bolton had an arrest, which was not disclosed to the defense.

---

App.—Texarkana 2001, pet. ref'd). In the interest of justice, however, we will consider whether Caldwell's letter to the trial court sufficed to request a hearing on the motion for new trial.
[14]Caldwell's counsel candidly acknowledged at oral argument his letter to the trial court was likely insufficient to request a hearing. This Court always appreciates and commends candor on the part of counsel.

Caldwell claims that had he known about this arrest, he could have used that information in cross-examining Bolton to impeach him. We disagree.

Specific acts of misconduct are admissible to impeach a party or witness only if both the crime was a felony or involved a crime of moral turpitude, regardless of punishment, and the trial court determines that the probative value of the evidence outweighs its prejudicial effects. *See Delk v. State*, 855 S.W.2d 700, 704 (Tex. Crim. App. 1993); *Reyna v. State*, 99 S.W.3d 344, 348 n.2 (Tex. App.—Fort Worth 2003, pet. ref'd); *see also* TEX. R. EVID. 609(a). An exception to the prohibition against impeachment through a prior conviction arises when the testimony of a witness during direct examination "opens the door" or leaves a false impression with the jury as to the extent of the witness' prior arrests, convictions, charges, or trouble with the police. *See Delk*, 855 S.W.2d at 704; *Reyna*, 99 S.W.3d at 349. Otherwise inadmissible evidence may be admitted if the party against whom the evidence is offered opens the door, provided the evidence does not stray beyond the scope of the invitation. *Feldman v. State*, 71 S.W.3d 738, 755–56 (Tex. Crim. App. 2002). An exception to that general rule against admission of unadjudicated bad acts arises when a witness leaves a false impression as to the extent of either his prior (1) arrests, (2) convictions, (3) charges, or (4) "trouble" with the police. *Prescott v. State*, 744 S.W.2d 128, 130–31 (Tex. Crim. App. 1988); *Hall v. State*, 161 S.W.3d 142, 156 (Tex. App.—Texarkana 2005, pet. ref'd).

13

Caldwell's theory is that Bolton opened the door by giving a false impression about his arrest history. When the State called Bolton to the stand, they questioned him about a felony controlled substance conviction from 1990 or 1991. Bolton acknowledged the conviction, for which he had been placed on community supervision. Later, on cross-examination, Caldwell asked what led Bolton to contact police and testify for the State:

> Q     [Defense Attorney]   Okay.   At the time that you gave the information on Mr. Caldwell, were you on probation?
>
> A     [Bolton]   No, sir.
>
> Q     Have you been promised any Crime Stoppers' reward or anything of that nature?
>
> A      No, sir.
>
> Q     What was your motivation on turning in Mr. Caldwell?
>
> A     You've got to tell me what you mean by motivation.
>
> Q     Well, I mean, why did you -- ?
>
> A     What was the reason why?
>
> Q     Why did you do it? Yes, sir.
>
> A     Because I seen on TV a show called "First 48," and if you help somebody that did something wrong you can go to jail for it.
>
> Q     So you thought your helping out [testifying for the State] would get you out of trouble, huh?
>
> A     It didn't.

Q      It didn't?  Have you been charged?

A      I don't know.

Q      Have you ever been arrested?

A      Yeah, I done been arrested before.

Q      You have?

A      Yes, I have been arrested.  I just told you I was on probation for drugs in '91.

Q      Okay.    Have you been arrested for aiding and abetting Mr. Caldwell?

A      No, sir.

Q      When you were on probation, did you do any jail time or anything like that?

A      I went to jail - - they arrested me and I went to jail, and then I got out.   I got out of jail - - I went to jail when I got arrested.

Q      After being placed on probation, did you go to jail?

A      No, sir.

Q      The morning that you delivered Mr. Caldwell to the bus station, did he have - - was he in possession of drugs?

Caldwell argues that Bolton effectively said that he had only been arrested for the drug offense which led to his 1990 or 1991 conviction.   There, Caldwell believes he should have been able to cross-examine and impeach Bolton with evidence that he had also been arrested in 2008 for deadly conduct and assault.   *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United States v. Bagley*, 473

15

U.S. 667, 676–77 (1985) (*Brady* evidence includes evidence that can be used to impeach State's witnesses); *Arroyo v. State*, 117 S.W.3d 795, 796 n.1 (Tex. Crim. App. 2003).

Bolton did not create a false impression that he had no other arrests than that involved in his old felony conviction. Defense counsel asked Bolton if he had been arrested or charged with assisting Caldwell in his flight from Bowie County's jurisdiction. Yes, counsel asked Bolton, "Have you ever been arrested?" but that was clearly in the context of the line of questioning about any charges for hindering apprehension regarding Bolton's involvement with Caldwell after the instant murder. It is important to look at the questions in context of the record. "In determining whether a false impression was created, . . . we must examine the testimony in context, rather than in a vacuum." *Moore v. State*, 82 S.W.3d 399, 407 (Tex. App.—Austin 2002, pet. ref'd), *overruled on other grounds by Taylor v. State*, 268 S.W.3d 571, 587 (Tex. Crim. App. 2008) (citing *Prescott v. State*, 744 S.W.2d 128, 131 (Tex. Crim. App. 1988)). Bolton may have misunderstood this question, as evidenced by his response, "Yes, I have been arrested. I just told you I was on probation for drugs in '91." Alternatively, he could have just as easily been replying that he had already said that he had been arrested, giving his testimony about the drug arrest. Caldwell did not ask about other charges except as they pertained to arrests arising from circumstances pertaining to this case. Caldwell's follow-up question again refers to any charges related to the instant case: "Have you been arrested for aiding and abetting Mr. Caldwell?"

In *Prescott*, the defendant was questioned about affidavits made by two witnesses who corroborated Prescott's version of events. When asked about the fact that the affidavits were signed and notarized in his attorney's office on the same day, Prescott said, "Well, I'm -- *this is my first time of going through this*. Hopefully my last. In other words, I don't -- I'm not sure about the legal lawyer (pause) whatever." *Prescott*, 744 S.W.2d at 130 (emphasis added by Texas Court of Criminal Appeals). The Texas Court of Criminal Appeals found Prescott had not opened the door to impeachment with this other offense.

> The appellant's response, "this is my first time of going through this. Hopefully, my last," cannot be examined in a vacuum. Yet such an analysis would completely ignore both the question which the appellant was attempting to answer and the context in which the response was given.

*Id.* Prescott's answer was in direct response to the posed question, and "restrictive, responsive, reasonable and understandable." *Id.*

As in *Prescott*, Bolton's answers to defense counsel's questions must be viewed in context; as such, Bolton did not create a false impression about his arrest history and did not open the door to impeachment with any cross-examination not expressly allowed by Rule 609. Thus, even if the State had tendered to Caldwell Bolton's 2008 arrest,[15] Caldwell would not have been able to use that arrest information to impeach Bolton.[16]

---

[15]There is no suggestion, in the record or by Caldwell, of any bad faith on the part of the State.

[16]It would have been impermissible for Caldwell to attempt to maneuver Bolton into "opening the door" or making a false representation of his arrest history on cross-examination. *See Lopez v. State*, 928 S.W.2d 528, 531–32 (Tex.

17

There was no error in the trial court's failure to hold a hearing, or rule on, Caldwell's motion for new trial. We overrule Caldwell's second point of error and affirm the trial court's judgment and sentence.


Bailey C. Moseley
Justice

---

Crim. App. 1996) (State could not create a false impression on cross-examination in order to open door to extraneous act evidence).

DISSENTING OPINION

The jury was not allowed to hear that Johnny Ward shot at a group including Greg Thomas, a few days before this incident. Thomas had identified Ward as the shooter and had given such a statement to the police. Both the original aggravated assault and the murder occurred a few days apart near the same place. So at the time Thomas was killed, he was the eyewitness for an aggravated assault for which Ward was arrested. If Thomas were not available, Ward would be the beneficiary. According to Taylor, within ten minutes Ward was seen a few blocks from the scene of the murder. The jury heard none of this, but only heard that Ward was brought in and questioned for this murder, but was released.

It is unclear when the "Able Term" entry was made (which inaccurately stated that Ward was charged with this murder). But, if this evidence had been admitted, a strong argument could have been presented that at the time the notation was entered, a representative of the District Attorney's Office (the admitted source of the entry) believed that Ward was not prosecuted for the aggravated assault because he had been charged with the murder of "the only witness in this case" (Thomas).

Caldwell should have been allowed to present this evidence showing the connection of Ward to Thomas and the fact that a representative of the District Attorney's Office had at one time believed that the only reason Ward was not charged for the first assault was that he had been charged with the murder of Thomas.

19

These facts are completely different from cases such as *Dickson*, where the excluded evidence was a comparison of photographs and judgments of prior offenses. In *Wiley*, the defense admitted the person proposed as the alternate perpetrator was too simple to plan and execute an elaborate arson even though he had recently been in and around the property.

The Texas Court of Criminal Appeals has determined that alternative perpetrator evidence is inadmissible unless a nexus is shown between the crime charged and the alleged alternative perpetrator. A nexus is a connection. The evidence here reveals a sufficient nexus to allow this evidence to be presented.

Since the evidence was relevant, it should be admitted unless the prejudicial effect substantially outweighs its probative value. TEX. R. APP. P. 403. The trial court found that to allow this evidence would require a mini-trial of the aggravated assault charge and cause confusion. I see no reason for a mini-trial on the assault charge; the identifying witness was dead. The pertinent issue is not whether Ward was in fact guilty of the previous assault charge, but that Thomas had identified him as the assailant, that Ward was in the area where it occurred, and at one time, a representative of the District Attorney's Office thought the charge for assault had not been pursued against Ward because he (Ward) murdered the eyewitness (Thomas). I do not find this evidence to be unfairly prejudicial. The majority opinion supports its conclusion by observing that the trial court cited Taylor's contrary testimony that Ward was not the murderer for its decision to exclude Caldwell's proffer. The fact that contrary evidence is presented cannot be a

determining factor in the decision to exclude evidence; it was the function of the jury to consider this evidence together with the State's evidence of guilt, resolve any conflicts, and then make its determination.

Finally, the court should examine if the error was harmful. First, it must be determined if this error was one of a constitutional violation. Exclusion of evidence may be a constitutional violation if (1) a state evidentiary rule categorically and arbitrarily prohibits the defendant from offering relevant evidence that is vital to the defense; or (2) when a trial court erroneously excludes relevant evidence that is a vital portion of the case and the exclusion effectively precludes the defendant from presenting a defense. *Ray v. State*, 178 S.W.3d 833, 835 (Tex. Crim. App. 2005) (citing *Potier v. State*, 68 S.W.3d 657, 659–62 (Tex. Crim. App. 2002); *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002)). Here, only the second category is involved.

Was Caldwell precluded from presenting a defense on a vital portion of the case? Evidence was introduced by the State that Ward, along with another, was brought in after the murder for questioning. This was portrayed as being "common" to bring in "everybody they can." Gunshot residue was taken from Ward, at which time Ward inquired as to how long residue would remain on the hands. Ward was "fully cooperative." On cross-examination, it was established that Ward was found at a convenience store somewhere close to the scene of the murder. Caldwell testified, but had no evidence concerning Ward's possible involvement in the murder.

21

This evidence does not present Caldwell's evidence of Ward's possible involvement in the murder. It was portrayed as routine police investigation that in effect cleared any consideration of Ward as the perpetrator. The evidence that would have been vital to this defense was the fact that Thomas had identified Ward as the assailant in the previous aggravated assault and that at one time, a representative from the District Attorney's Office thought Ward had been charged with the murder of Thomas. The erroneous exclusion of evidence prevented Caldwell from presenting his only real defense—that Ward, who was near the scene of the murder, had a strong motive in the demise of Thomas. Consequently, this is error of a constitutional nature, and we must reverse unless it is determined beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a).

Without the jury hearing any inculpatory evidence concerning Ward, it was permitted to hear that the investigating officers had cleared him of any wrongdoing. To determine, beyond a reasonable doubt, that the exclusion of this evidence would not contribute to the conviction, we must be assured the jury would not believe this proffered evidence linked Ward to the murder. While no one can ever know what a jury would have done if provided with other evidence, the trial court's ruling prevented the jury from even considering this relevant evidence. I do not think it is reasonable to conclude, beyond a reasonable doubt, the error did not contribute to the conviction. The judgment should be reversed for a new trial.

I respectfully dissent.


Jack Carter
Justice


Date Submitted:     September 28, 2011
Date Decided:       October 21, 2011

Publish