

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-11-00171-CR

MARK ALLEN MCDANIEL, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 336th District Court
Fannin County, Texas
Trial Court No. CR-10-23446

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

O P I N I O N

After a previous trial resulted in a hung jury, Mark Allen McDaniel was convicted by a jury in a second trial of the aggravated sexual assault of M.B., a child, and was sentenced to twenty-five years' imprisonment. On appeal, McDaniel raises three points of error: (1) he maintains that the trial court erred in failing to hold a hearing on his motion for new trial, (2) he asserts that the evidence was legally insufficient to convict him, and (3) he complains that the trial court's rulings wherein evidence was excluded based on applications of the Texas Rules of Evidence denied him "the ability to present a defense and cross examine witnesses, in violation of the Due Process Clause of the Fifth and Fourteen Amendment[s] and the Confrontation Clause of the Sixth Amendment." We find that: McDaniel failed to preserve his first issue for our review because he failed to show that the motion for new trial was properly brought to the attention of the trial court, the evidence at trial was legally sufficient to support the judgment, and the trial court's evidentiary rulings did not deprive McDaniel of the right to present a defense. Accordingly, we affirm the trial court's judgment.

I.      Factual and Procedural History

Ryan and Elise Burns and their children (Mae, Mabel, Michael, and four-year-old M.B. [1]) lived next door to the residence of Mark and Linda McDaniel. The children had a reputation of playing and running around the neighborhood unsupervised. They would often play in the McDaniels' yard, leave their toys on their property, walk into their home uninvited, tie their dog

_____

[1]The names of the children have been changed to protect their identity.

to the McDaniels' fence, and remove the McDaniels' mail from the mailbox. Despite these things, the Burnses maintained a neighborly relationship with the McDaniels.

Elise described McDaniel's demeanor as "friendly." McDaniel would offer the children popsicles and would play a game called "treasure hunt" wherein, Mabel testified, McDaniel "got pennies and he hid them . . . on his porch in, like, bushes and on the concrete and under his bench sometimes" for the children to find. McDaniel also gave the children small gifts and allowed them in his home on multiple occasions.

The amicable and neighborly feeling held by the Burnses toward McDaniel changed abruptly on May 11, 2010. Elise explained that on that day:

> I was taking the kids to school. . . . I had all the kids in the car and we pulled out of our driveway and pulled up to the stop sign . . . . [McDaniel was] walking his dog across the street, and [M.B.] -- from the backseat -- piped up and she said, That's Mr. Mark and I don't like sucking on his private. . . . And then she started saying, Oh, it's a secret.

Some of the exchange between M.B. and her mother as related in court seemed a bit nonsensical, with M.B. saying that McDaniel "had a candy on the floor," "that she didn't like it," and that what M.B. had sucked "was green and red and yucky." More clearly, M.B. drew a picture for her mother of an "elongated, hotdog-looking" object that according to Elise's opinion, "looked to me like a four-year-old's depiction of a male penis." While Elise was questioning twelve-year old Mae, Elise stated that "[M.B.] came running in and she said, Mommy, I'm sorry for making a bad choice; I'm sorry I sucked on his private. And that was the first time that she'd ever expressed shame, because she knew I'd been crying."

3

Ryan testified Elise was "freaked out," "amazed, shocked, [and in] disbelief" when she informed him of M.B.'s outcry. Elise's counselor, Angela Corrigan, testified that she received a telephone call on May 11, 2010, from a "very upset" Elise who "sounded on the brink of tears." Corrigan testified that Elise said "that morning while she was taking the children to school, that her youngest child had told her that -- just out of the blue . . . I don't like sucking Mr. So-and-so's privates." Elise asked Corrigan if she should bring M.B. for counseling, but Corrigan "told her that [her] policy is that, because a child doesn't need to be questioned over and over and that it's such a sensitive situation, that she needed to contact law enforcement and follow their procedure for that investigation."

Elise took a typewritten statement of events to the police and spoke with Honey Grove Police Chief Mark Johnson. After having received the report from Elise, Johnson questioned McDaniel. Although McDaniel acknowledged having played the treasure hunt game with the Burns children, he claimed to know all of the children except for M.B. Johnson testified that Elise appeared quite emotionally upset because "[w]hen she came to me, she'd just learned about it that morning." Kassi Bowen of the child advocacy center also testified that Elise "seemed upset. Her cheeks were very red. Her eyes were swollen from crying and during the intake process, there was some crying, as well."

Interviewer Brittney Martin testified that M.B. drew a picture of a penis with a blue marker and described McDaniel's private as brown and blue[2] and "slippery or slick." M.B.

---

[2]The witness said that it was not uncommon for a child to attribute the color of something to whatever color crayon the child had in their hand at the time.

4

reported that "she was choking and choking and choking" when McDaniel's penis was in her mouth.

M.B. was taken for an examination by sexual assault nurse examiner (SANE) Nikki Norton on May 13, 2010. Although Norton, acting as a SANE, "usually . . . take[s] a history from the child alone," Elise asked Norton not to speak with M.B. because she was hoping M.B. "would forget this whole thing." Norton noticed that M.B. had "some pinpoint lesions to the roof of her mouth," but because she had tonsillitis, the findings of the examination were nonspecific.

At trial, five-year-old M.B. said that she was playing outside with her siblings, Mabel and Michael, when McDaniel asked her into his home. M.B. testified that after she complied, McDaniel "did something bad," "pulled down his pants," and "told me to suck on his private." At first, she testified that she did not comply. M.B. then stated, "I sucked on his private and he squeezed it." According to M.B., McDaniel's private felt like "[h]air" and was "[w]hite and black." M.B. testified that she immediately went home and told her mother who "was inside playing the piano."

The jury convicted McDaniel after hearing this evidence.

## II.   McDaniel's Point of Error Complaining of the Denial of a Hearing on His Motion for New Trial Was Not Preserved

McDaniel complains that the trial court was required to hold a hearing on his motion for new trial on issues that were not determinable from the record. "The right to a hearing on a motion for new trial is not absolute." *Rozell v. State*, 176 S.W.3d 228, 230 (Tex. Crim. App.

5

2005). In *Rozell*, the Texas Court of Criminal Appeals held that a defendant could not complain that a trial court failed to hold a hearing on a motion for new trial where the defendant did not present the motion to the trial court by giving the court actual notice of the desire to have a hearing. *Id.* (citing *Carranza v. State*, 960 S.W.2d 76, 79 (Tex. Crim. App. 1998)); *see Todd v. State*, 242 S.W.3d 126, 133 (Tex. App.—Texarkana 2007, pet. ref'd).

A motion for new trial must be presented to the trial court within ten days of being filed. TEX. R. APP. P. 21.6. "'Presentment' must be apparent from the record, and it may be shown by such proof as the judge's signature or notation on the motion or proposed order, or an entry on the docket sheet showing presentment or setting a hearing date." *Gardner v. State*, 306 S.W.3d 274, 305 (Tex. Crim. App. 2009). "Mere filing of the motion for new trial with the trial court is insufficient to constitute presentment." *Caldwell v. State*, 356 S.W.3d 42, 49 (Tex. App.—Texarkana 2011, no pet.); *see Stokes v. State*, 277 S.W.3d 20, 21 (Tex. Crim. App. 2009); *Carranza*, 960 S.W.3d at 78. "The Rules of Appellate Procedure . . . require some documentary evidence or notation that the trial judge personally received a copy of the motion and could therefore decide whether to set a hearing or otherwise rule upon it." *Gardner*, 306 S.W.3d at 305; *see Morrow v. State*, 139 S.W.3d 736, 746 (Tex. App.—Texarkana 2004, no pet.). "[W]ithout any showing that the trial judge actually saw appellant's motion for new trial, the judge cannot be faulted for failing to conduct a hearing on that motion." *Gardner*, 306 S.W.3d at 305. To evidence presentment, "such a notation [must] establish that it is the 'judge's notation.'" *Stokes*, 277 S.W.3d at 21 (quoting *Carranza*, 960 S.W.2d at 80 n.6); *see Bearnth v. State*, 361

S.W.3d 135, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (finding prayer in motion for new trial requesting hearing to be insufficient to constitute presentment).

In this case, there is nothing in the record to show that McDaniel presented the motion for new trial to the trial court.[3] There is no order denying the motion for new trial, no date set for a hearing, no notation on the docket sheet referencing the motion, and no notation or signature by the judge indicating the court was put on actual notice of the motion. Absent presentment of the request for hearing, we need not decide whether the trial court abused its discretion in failing to hold a hearing on McDaniel's motion for new trial because the issue was not preserved for appellate review. *Rozell*, 176 S.W.3d at 230. McDaniel has failed to preserve this point of error for our review, and it is overruled.

## III.    The Evidence Was Legally Sufficient to Convict McDaniel

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of aggravated sexual assault of a child beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve

---

[3]Without citation to the clerk's record, McDaniel stated, "[T]here is no rhyme or reason in the Court's refusal to hold a hearing other than to state that there would be 'no action' on the motion," implying that some notation was made with respect to the motion for new trial. However, our review of the record demonstrates that the "no action" notation was made in response to a motion requesting an indigency hearing.

conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

The indictment states that "on or about May 11, 2010,"[4] McDaniel "did then and there intentionally or knowingly cause the mouth of [M.B.], a child who was then and there younger than 6 years of age, to contact the defendant's sexual organ." Under a hypothetically correct jury charge, the State was required to prove that McDaniel intentionally or knowingly caused the penetration of the mouth of (M.B.), a child younger than fourteen years of age, by his sexual organ. TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(ii), (a)(2)(B) (West Supp. 2012).

M.B. testified that she "sucked on [McDaniel's] private" after he instructed her to do so. She reported the action to her mother and to Martin and drew a picture of what appeared to be a male sexual organ for both. The testimony of a child victim alone is sufficient to support a

---

[4]Long-standing precedent holds that the State is not bound by the date alleged in the indictment as long as it proves the offense occurred within the period covered by the applicable statute of limitations. *Garcia v. State*, 981 S.W.2d 683, 685 (Tex. Crim. App. 1998); *Sledge v. State*, 953 S.W.2d 253, 255–56 (Tex. Crim. App. 1997); *Mireles v. State*, 901 S.W.2d 458, 459 (Tex. Crim. App. 1995); *see also* TEX. CODE CRIM. PROC. ANN. art. 21.02 (West 2009) (time mentioned must be anterior to presentment of indictment and not so remote that offense is barred by limitations).

conviction for aggravated sexual assault. TEX. CODE CRIM. PROC. ANN. art. 38.07 (West Supp. 2012); *Scott v. State*, 202 S.W.3d 405, 408 (Tex. App.—Texarkana 2006, pet. ref'd); *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd). We conclude that the evidence presented was sufficient for a rational jury to convict McDaniel of aggravated sexual assault of M.B.[5]

## IV. The Trial Court Did Not Deprive McDaniel of the Right to Present a Defense

In the prior trial, which resulted in a mistrial,[6] McDaniel established that Elise was aware of a pending investigation or case by the Child Protective Services (CPS) agency pertaining to the Burns children before the sexual abuse allegations. McDaniel suggested in the previous trial (i.e., the trial which resulted in a hung jury) that M.B. had been subject to coaching and that the sexual assault allegation was fabricated by Elise "because she was afraid of losing her children." In other words, McDaniel suggested that Elise had a motive to deflect CPS attention from her and focus attention onto McDaniel. To contribute to the understanding of McDaniel's defensive strategy, we review the facts that were presented to the jury in this case.

---

[5]McDaniel argues that "the factual claims were incredible until a year later when the hair became black and penis became white, versus the blue, green and brown originally alleged." The fact that a witness makes inconsistent statements does not necessarily destroy his testimony as a matter of law. *McDonald v. State*, 462 S.W.2d 40, 41 (Tex. Crim. App. 1970) (evidence legally sufficient to support aggravated assault conviction based on prosecuting witness' testimony even though testimony inconsistent); *Reed v. State*, 991 S.W.2d 354, 360 (Tex. App.—Corpus Christi 1999, pet. ref'd) (evidence legally and factually sufficient to support aggravated sexual assault of child conviction based on victim's testimony even though testimony contradictory). The weight to be given inconsistent testimonial evidence is within the sole province of the jury because it turns on an evaluation of credibility and demeanor. *See Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993); *Reed*, 991 S.W.2d at 360. As fact-finder, the jury is entitled to accept some portions of a witness' testimony and reject other portions. *See Hughes v. State*, 897 S.W.2d 285, 289 (Tex. Crim. App. 1994).

[6]In McDaniel's first trial on May 23, 2011, he was acquitted of indecency with a child by contact, and a mistrial was declared on a count for aggravated sexual assault of a child as alleged in this indictment.

Neighbor Pam Harris testified that Elise did not watch the children in 2010 and that she would have to "get them out of my flower beds" to keep them from breaking garden decorations. Harris observed that the children were once locked out of their house and would come to her house uninvited to visit with her. On April 19, 2010, Harris made the initial call to CPS prompting an investigation.

McDaniel's wife, Linda, shared Harris' observations about the lack of parental supervision of the children. The children "would run across the street and not look when they crossed the street to try to get their dog." In 2009, she found Mabel in her home holding a musical figurine. Linda testified that "at that time, I told her that, You can't come into somebody's house unless you're invited to, and she put the figurine down and -- well, I also told her, Your mom doesn't know where you are, and she just put the figurine down and I assume she went home." The child had also once pulled down the McDaniel's bird bath on top of herself. Linda asked Elise to better monitor her children.

Linda testified that McDaniel "made a phone call to the sheriff's department on April 23[, 2010] to have a Honey Grove policeman come to our property. He specifically asked would they have the officer come to the side -- to our side street so that he could talk to them." According to her,

> What prompted the phone call is, again, the children running across the property, across streets to get their dog. And Mark had told me that he was concerned about the kids, from getting hit by cars. We had had problems before with the kids running across the street. If they'd see somebody or a dog, they'd just run across the street and we were afraid they were going to end up getting hurt, and he

10

thought if maybe somebody talked to the parents, they would understand the seriousness of this.[7]

Linda recalled another incident, stating:

[t]he week before these allegations were made, [Mabel] was over on our property. She had an envelope in her hand. . . . and she came up to us . . . and she had a letter. . . . It was opened, and she said, This is your mail, or This is yours. And there was a check inside, and she said, You've got more mail in your mailbox, and I scolded her. . . . I was concerned has this happened before and will it happen again.

Within earshot of the child (and even though she was unaware of a CPS investigation prompted by a call from Harris), Linda told McDaniel, "If I have one more problem out of those kids, I'm going to turn them in to CPS." Linda testified that the allegations against McDaniel were made on the "Tuesday of the next week." McDaniel suggested that Elise may have gotten information from Mabel that Linda was going to "turn them into CPS," found out about the CPS investigation, assumed that the complaint was made by Linda,[8] and retaliated by fabricating the sexual assault allegation. However, testimony involving when Elise learned of the CPS allegation was materially different in this case than in the previous case in which a hung jury resulted. In the prior trial, although Elise testified that she was not aware of the date the investigation began[9] and did not testify when she was first made aware of the allegations, CPS

---

[7]McDaniel also testified that he called law enforcement because "[m]y patience was [sic] run out" with the children who running around without supervision across the road. He stated that he did not molest M.B., that Elise lied, and that the children were "put up to" testifying against him. Officer Johnson testified that there was no record of any officer going to the McDaniels' home on April 23. Kristy Westcott, "custodian of the 9-1-1 records," also testified that another officer said there were no calls from the McDaniels on April 23, although it appears that the wrong address was searched and the records could not be searched by telephone number.

[8]Elise testified that she believed the complaint came from Harris.

[9]In the previous trial, Elise did not testify whether she knew of the CPS allegations prior to the outcry.

11

worker John Russell testified that Elise heard about the CPS investigation before the allegations were made.

Russell testified that he "made a couple attempts to try and get in touch with the family," met "up with the kids at school," spoke to the children, their principal, Elise, and Ryan, and was "prepared to rule the case out" when he got "word that an outcry had been made of sexual abuse." He testified that he met with the Burnses in their home on April 23, 2010, prior to M.B.'s outcry in May. The CPS records corroborated this timeline. In other words, the records confirm that the Burnses met with Russell on April 23, prior to the sexual assault allegation. The CPS report did not say anything about the sexual assault allegation during the initial meeting with Russell, and Russell did not testify that there was any kind of outcry made at that time.

In this trial, Elise testified that she became aware of the CPS investigation May 12, 2010, the day after the outcry. She also stated that her interview with Russell occurred May 14, 2010. Thus, her testimony removed the defensive strategy of arguing that the sexual assault allegation was fabricated by Elise to distract from the CPS investigation into the suitability of the supervision of her children.

Russell's testimony also hurt the defensive strategy. Russell took the stand in this trial and recanted his previous testimony regarding the timeline of events. Although Russell had described that he spoke to the parents and was going to rule out the case when an outcry was made in the first trial, Russell testified that his CPS report was simply wrong, the dates were incorrect, and that the Burnses would not have known about the investigation prior to the allegation of sexual abuse because he met the Burnses for the first time after the allegations were

12

made. He then testified that prior to the first meeting, "Elise -- I can't remember if she actually told me on the phone on the way over to the house or told me when I got to the house or maybe a combination of the two" that sexual abuse had occurred. In apology, Russell told the jury, "I've since had a lot of time to review and reflect on and I don't feel that it was my best work and probably inaccurate in some degree as far as the dates go."

McDaniel argues that the trial court refused to allow him to introduce testimony that would contribute to his defensive theory, even though it was undercut by Elise and Russell's testimony. He complains that the court's rulings in failing to admit the following evidence resulted in a denial of due process and the right to confrontation because it denied him the right to present a defense:

- a prior 2007 CPS case involving M.B.'s brother;
- "financial, sexual and relationship problems which could account for a false allegation";
- testimony that M.B.'s mother fabricated a false story about a dog attack in order to extort a neighbor who moved in after the McDaniels left the neighborhood;
- testimony of another neighbor that M.B.'s mother was not upset after the outcry;
- testimony from a neighbor that a CPS worker believed the case against McDaniel was "signed, sealed delivered," and that he would go to prison for life.

We discuss the evidence McDaniel sought to admit in turn.

### A.  Prior and Pending CPS Case

Through the testimony of neighbors, it was established that the Burns children were known to play outside unsupervised. In 2007, Officer Todd Morrison "almost ran over" toddler Michael who was playing in the middle of Main Street. Elise was arrested and CPS was notified and became involved. McDaniel wanted the jury to hear about this incident.

13

When counsel was about to question Elise on the 2007 CPS case, the following occurred:

> MR. SETTERBERG: My best guess is that we're going to go into the 2007 CPS case which has absolutely nothing to do with this case either directly or logically. We'd object to any questioning about it as an extraneous specific offense or specific -- we'd object to it as irrelevant and violative of 404, is improper character evidence, and 403 as tending to take a long time to develop and confuse the jury.

> THE COURT: Your response, Mr. Belden.

> MR. BELDEN: Your Honor, our entire defense is her fabricating this story due to her previous history with CPS and the timeline attached with it. The evidence would --

> THE COURT: I've already heard the -- I know what the general --

> MR. BELDEN: The prior incident is relevant to why she would have motive to lie when CPS comes calling back into her life.

> MR. SETTERBERG: Logically --

> THE COURT: I'm going to sustain the objection.

McDaniel's counsel had previously admitted that the McDaniels were not involved in the 2007 case. The court found that the three-year-old CPS case, which did not involve the McDaniels, should have been excluded under the Texas Rules of Evidence.

### B.     Financial, Sexual, and Relationship Problems

McDaniel sought to inform the jury about Elise's financial, sexual, and relationship problems. He wanted to demonstrate that Elise fabricated the sexual assault allegation in order to ease these marital tensions by using the allegation as a shield to protect her from CPS. It does not appear that counsel questioned Elise regarding financial problems. However, Corrigan testified in an offer of proof that Elise told her she was having financial problems.

14

With respect to "relationship problems," the following discussion occurred during Elise's cross-examination:

> MR. SETTERBERG: Judge, I'm going to object. I don't see any logical relevance between any marital problems between the witness and her husband and her motive to falsely allege the defendant sexually assaulting her daughter. I'd object to the extent having marriage problems is a bad act or conflict with your -- with your spouse is a bad act. That's going to violate 404 and 403 and, again, it would be a relevance objection.
>
> MR. BELDEN: Your Honor, the relevance is, she was under CPS investigation at the time, she was having marital problems, seeking marriage counseling, and when CPS comes down on her which would cause further marital problems, she falsifies an allegation of sexual misconduct.
>
> MR. SETTERBERG: Well, except that the outcry came on the 11th and she didn't talk to CPS until the 12th.
>
> MR. BELDEN: You know Josh interviewed her on April 23rd. That's prior testimony.
>
> THE COURT: Well, I'm going to sustain the objection.

McDaniel attempted to have Corrigan testify to Elise's prior treatment as evidenced by this excerpt:

> Q. Well, but you had counseled her before the allegations in this case, hadn't you?
>
> A. Yes, sir.
>
> MR. SETTERBERG: Judge, if they don't pertain to the allegations of the case, I'd object to any testimony about her previous counseling sessions.
>
> THE COURT: Sustained.
>
> Q. (By Mr. Belden) Okay. How long had you been counseling her for?

15

A.    I was not --

MR. SETTERBERG:  Well, Judge –

A.    (By the Witness) -- counseling her at the time that she --

MR. SETTERBERG:   -- it's the same objection. I'm going to object --

THE COURT:  Sustained.

MR. BELDEN:  Your Honor, it goes to the bias, and it's relevant as to how long this witness has had a relationship with the complaining witness.

During an offer of proof, Corrigan stated that Elise reported having pre-outcry relationship, financial, and sexual difficulties which were unrelated to the outcry. The court disallowed this testimony.[10] However, the record shows that the jury was aware of Elise's prior treatment with Corrigan for marital issues (not financial issues), and Corrigan testified that even with these issues, she did not see any reason for Elise to lie about the allegation.

### C.    Story of the Dog Attack

The following discussion occurred during Elise's cross-examination:

Q.    Now, you subsequently made false allegations about your neighbor to the Honey Grove Police Department; is that correct?  Your new neighbor, Brent Johnson?

MR. SETTERBERG:  Judge, I'm going to object to relevance and improper impeachment.  Also improper character evidence.

THE COURT:  Sustained.

---

[10]At trial, McDaniel's counsel objected that the court's ruling violated the Confrontation Clause, but did not claim that the right to present a defense was violated.

16

Q. (By Mr. Belden) Now, did you ever tell the police department anything false about Brent Johnson?

MR. SETTERBERG: Same objection, Judge.

THE COURT: Sustained.

Brent Johnson purchased the McDaniels' home after they moved. In an offer of proof, he testified that Elise made a report that his dog attacked the Burnses' dog, causing Johnson's dog to be put down. Johnson testified that the veterinarian said the Burnses' dog "really wasn't hurt." Even though he was not informed of what Elise told the police, he did not believe his dog attacked their dog because his dog was secured. Johnson also said that the Burns children were in his yard and that he confronted Elise and told her he "was aware of what happened to the man that used to live there," "[t]hat will not happen to me and my family," and instructed her to "keep a better eye on the kids." He testified that Elise was an untruthful person.

The trial court disallowed the testimony regarding the dog and the resulting opinion on Elise's truthfulness because "the period of time that he knows the individual is past the time of the alleged offense and doesn't meet the other statutory requirements, either."

### D. Harris' Testimony

McDaniel also sought to admit certain testimony from Harris. Harris testified that Russell indicated he was not going to investigate the case because he told her "it was a sign, sealed, delivered case, and she caught him in the act." Although a hearsay objection was sustained, the State did not request, and the trial court did not instruct, the jury to disregard that statement made by Harris. During an offer of proof, Harris clarified that Russell stated that Elise

17

had caught McDaniel in the act, told her that "it was all signed" and that McDaniel would "get a hundred years in the pen." Harris also testified that when she asked about the allegation, Elise "didn't have a tear in her eyes. I have never witnessed a mother -- because I'm a mother, myself. I raised two kids. So, I don't believe what she said -- I'm sorry -- because a mother would be hysterical on this." After the offer of proof, the court permitted Harris to testify about her conversations with Russell "for the limited purpose of impeachment of Josh Russell, if it does, in fact, impeach him."

It does not seem that there was a ruling prohibiting Harris' testimony regarding Elise's demeanor when questioned about the abuse allegations. After the jury was seated, McDaniel did not inquire about the matters he wanted Harris to testify about. Instead, McDaniel's counsel passed the witness after establishing that Harris had never seen McDaniel behave inappropriately towards the children.

### E. The Trial Court's Evidentiary Rulings Did Not Deprive McDaniel of the Right to Present a Defense

Although McDaniel claimed at oral argument that he was questioning the trial court's evidentiary rulings, his briefing demonstrates otherwise. The brief did not challenge the grounds that were used by the trial court to exclude the evidence McDaniel wanted in front of the jury. In other words, the brief did not suggest that the trial court erred in disallowing testimony based on Rule 401, 403, or 608, and no explanation for why the trial court erred in its rulings was offered either in the brief or at oral argument. This Court is not the advocate for any party appearing before it. Although we have an interest in a just adjudication, we also have an interest in

18

remaining impartial. *Ex parte Lowery*, 840 S.W.2d 550, 552 n.1 (Tex. App.—Dallas 1992), *rev'd on other grounds*, 867 S.W.2d 41 (Tex. 1993). Thus, we will not address the propriety of the trial court's rulings based on the Texas Rules of Evidence since challenges to the rulings were not brought before us. Instead, we address the only claim raised in the brief for which authority was cited.

McDaniel alleges that the trial court violated due process in taking "a course of conduct to prevent Mr. McDaniel to present [his] defense . . . and to cross examine witnesses to show that Mrs. Burns was making this outrageous allegation because she was afraid of losing her children." In support, he cites the cases of *Holmes v. South Carolina*, 547 U.S. 319 (2006), and *Holmes v. State*, 323 S.W.3d 163 (Tex. Crim. App. 2009).

In *Holmes v. South Carolina*, the defendant sought to introduce proof that another man committed the crime. 547 U.S. at 323. The trial judge excluded the evidence under the *Gregory* rule[11] governing the admissibility of third-party guilt evidence. *Id.* at 323–24. The purpose of the *Gregory* rule was "to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues." *Id.* at 330. The Unites States Supreme Court wrote:

> "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." This latitude, however, has limits. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" This right is abridged by evidence

---

[11]So called because of the South Carolina Supreme Court case from which it arose, *State v. Gregory*, 16 S.E.2d 532 (S.C. 1941).

19

rules that "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"

*Id.* at 324–25 (citations omitted). It then held that the *Gregory* rule was "arbitrary" because it did not rationally serve the end that it was designed to further. *Id.* at 331. Thus, the court concluded that the *Gregory* rule, which applied to exclude the evidence that another man committed the crime, violated the defendant's rights to have a meaningful opportunity to present a complete defense. *Id.* at 325.

The court also provided other examples of arbitrary rules that "excluded important defense evidence but that did not serve any legitimate interests." *Id.* It cautioned, however, that,

> [w]hile the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.

*Id.* at 326.

Texas Courts have distinguished *Holmes v. South Carolina* when the rule relied on by trial courts to exclude evidence is not arbitrary or disproportionate to its purpose. *Soffar v. State*, No. AP-75363, 2009 WL 3839012, at *13 (Tex. Crim. App. Nov. 18, 2009) (per curiam) (not designated for publication)[12] (because hearsay rule not arbitrary, proper ruling excluding evidence under rule did not amount to constitutional error); *Zamora v. State*, 375 S.W.3d 382, 389–90 (Tex. App.—Houston [14th Dist.] 2012, pet. struck); *Moland v. State*, No. 01-10-00869-CR, at *6, 2012 WL 403885 (Tex. App.—Houston [1st Dist.] Feb. 9, 2012, pet. ref'd) (mem. op.,

---

[12]Although this unpublished case has no precedential value, we may take guidance from it "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

not designated for publication) (distinguishing *Holmes v. South Carolina* because trial court "excluded the statements under the hearsay rule, an established evidentiary rule").

In *Holmes v. State*, a trial court prohibited the defense from cross-examining an intoxilyzer expert, resulting in pleas of no contest. 323 S.W.3d at 172. Appellants argued that this ruling operated to deny the Sixth Amendment right to cross-examination, resulting in a deprivation of the right to present a defense. *Id.* at 173. Citing *Holmes v. South Carolina*, the court on rehearing agreed, stating, "[W]hat was excluded here was not simply the ability to question an expert—it was the right to present a defense." *Id.* It highlighted the following language from *Pointer v. Texas*:

> There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, we have expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.

*Id.* (quoting *Pointer v. Texas*, 380 U.S. 400, 405 (1965)). The failure to allow cross-examination of the intoxilyzer expert was found to be error because it contributed to the defendant's plea of no contest and deprived him of the right to present a defense. *Woodall v. State*, 216 S.W.3d 530, 536–37 (Tex. App.—Texarkana 2007), *aff'd by Holmes v. State*, 323 S.W.3d 163. There was no rule of evidence prohibiting the cross-examination. *See id.* In other words, if a trial court relies on an established rule to exclude evidence, the right to present a defense is not violated.

From our reading of the record, it appears that the trial court's rulings were based on the application of established rules of evidence. A defendant does not have the unfettered right to

21

present all favorable evidence. *Potier v. State*, 68 S.W.3d 657, 659 (Tex. Crim. App. 2002). Rather, a "defendant has a fundamental right to present evidence of a defense as long as the evidence is relevant and is not excluded by an established evidentiary rule." *Miller v. State*, 36 S.W.3d 503, 507 (Tex. Crim. App. 2001). McDaniel's brief does not claim that the trial court abused its discretion in its application of established evidentiary rules, and we find that McDaniel's right to present a defense was not violated by the application of the Texas Rules of Evidence.

McDaniel's last point of error is overruled.

## V.       Conclusion

We affirm the trial court's judgment.

Bailey C. Moseley
Justice

Date Submitted:      November 20, 2012
Date Decided:        December 18, 2012

Do Not Publish

22